**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenneth TOWNS, also known as Kareem Allahdeem, Defendant–Appellant.**

**No. 89–2526.**

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1990.

Decided Sept. 18, 1990.

As Amended Sept. 20, 1990.

Rehearing Denied Nov. 21, 1990.

Robert W. Kent, Jr., Barry R. Elden, Asst. U.S. Attys., Office of U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Miriam F. Miquelon, Debra Rae Bernard, Keck, Mahin & Cate, Nathan P. Eimer, Sidley & Austin, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, JR., Circuit Judge.

Defendant Kenneth Towns appeals the district court's entry of final judgment on the jury verdict finding him guilty of conspiracy to rob a bank and to use dangerous weapons to carry out the offense in violation of 18 U.S.C. § 371; robbing the bank in violation of 18 U.S.C. §§ 2 and 2113; and using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Towns claims that his arrest was made without probable cause and the subsequent search of an apartment where he was staying was made without his consent. Towns also alleges that he was denied a fair and impartial trial when the trial judge failed to recuse himself, erroneously admitted certain evidence, and denied the defendant's motion for mistrial following his codefendants' guilty plea after the jury was impanelled.

## I. FACTUAL BACKGROUND

On December 10, 1987, Randall Crane asked his sister to use her credit card to rent a car for him. The pair rented a grey 1988 Lincoln Continental bearing California license plates. Crane signed the car rental contract using the name David Alvin. Crane then drove from Los Angeles to Chicago with his close associates Kenneth Towns (also known as Kareem Allahdeem) and Clarence Gilkey (also known as Rashad Shabazz).

Sometime around December 24, 1987, Towns, Gilkey, and Crane arrived at the apartment of Lamont Jackson at 7008 South Clyde in Chicago. Cecile Jackson, Lamont Jackson's sister, lived across the street in an apartment at 7007 South Clyde. Cecile Jackson and Towns were the parents of a four-year old daughter who lived with Cecile. Cecile agreed to allow Towns to periodically stay in her apartment from December 24, 1987, until January 27, 1988. During this period, both Cecile and Lamont Jackson saw Towns together with his traveling companions Gilkey and Crane.

On January 28, 1988, Towns allegedly assisted Crane and Gilkey in their armed robbery of Illinois Federal Savings & Loan ("the bank") at 351 East 87th Street in Chicago. Defendant Crane walked into the lobby of the bank, drew an automatic firearm, and ordered a security guard and another bank employee to lie on the floor. At some point after that, Crane donned a black ski mask. Moments later, defendants Gilkey and Towns allegedly entered

the bank. A bank teller discreetly tripped a silent alarm that activated the surveillance cameras that were located in the bank. Gilkey, who was also wearing a ski mask and carrying a gun, jumped over the teller counter, followed by an accomplice. Cecile Jackson later identified the accomplice, who carried a handgun and wore a dark nylon jacket, a dark sweatsuit, a wool cap, and sunglasses, pictured in still photos as Towns. At Towns's trial, Lamont Jackson testified that the second robber to enter the bank, who was photographed carrying a small nylon bag, was defendant Gilkey. Gilkey and Towns allegedly ordered Greg Brown, a bank employee, to open the safe. Brown complied with the request, and one of the defendants repaid him for his troubles with a pistol-whipping to the head. Brown placed $142,700 in various denominations, which was bound by money wrappers, into a bag that one of the robbers had provided. The robbers then fled the bank.

At about 4:00 p.m. that same day, Towns arrived at Lamont Jackson's apartment and asked if Cecile Jackson had left the keys to her apartment. Upon learning that she had not left her keys, Towns, Crane, and Gilkey received Lamont's permission to wait in his apartment for Cecile to return from work. Lamont found Towns's informal attire of a blue sweatsuit to be unusual because Towns was normally an impeccable dresser. Crane was carrying a white plastic grocery bag that was full, but Lamont could not discern its contents because the top of the bag was covered with dark clothing. Lamont gave his visitors another bag after one of them had requested it. When Cecile arrived at Lamont's apartment at approximately 8:20 p.m., Towns, Crane, and Gilkey went across the street to Cecile's apartment.

Cecile noticed that her guests had two bags, and she asked Towns if she could peek into them. Towns refused her request, and stated that they were Crane's property. Crane and Gilkey later left the apartment, and Towns stayed overnight. The next morning, Cecile gave Towns her keys, instructed him to take their daughter to Lamont's apartment, and left for work.

On the morning of January 29, 1988, a patron of Chicago Police Officer Joseph Oliver's restaurant called Oliver to inform him that a bank robbery had occurred the previous day on 87th Street, that the person who committed the robbery drove a Lincoln Continental, and that she had observed certain items involved in the robbery. Oliver called his station and learned that Illinois Service Federal on 87th and Martin Luther King Drive had been robbed the previous day by three black males who fled in a light blue Lincoln Continental.

Several hours later, the informant telephoned Oliver again to provide additional information. The caller stated that on the previous evening she had been with three men in an apartment, that she had seen some guns, that she overheard the men discussing the bank robbery, and that she heard them state that the money was in a bag. The informant said that she had seen the three suspects in a Lincoln Continental bearing California license plates, and added that they resided in California and were getting ready to return. The caller also revealed that the first name of one of the men was "Kareem," who the caller described as being "clean-cut," about six feet tall, and weighing approximately 200 pounds. The caller also told Oliver that Kareem was located in the area of 70th and Clyde and that he was staying with a woman and child in an apartment across the street from the apartment where the caller had seen him and heard the discussion about the bank robbery. The caller concluded the conversation by giving Oliver the telephone number of the apartment where Kareem was ensconced.

Oliver went to his office, checked the telephone number that the informant had given him, and learned that it belonged to a second-floor residence at 7007 South Clyde. Oliver and several other police officers conducted surveillance in the area, and discovered a light blue Lincoln Continental with California license plates parked approximately one block from 7007 South Clyde. During their five-hour surveillance, the officers did not have any of the surveillance photos from the bank robbery and there-

fore relied exclusively on the description that the confidential informant had given.

Chicago Police Officer Brad Williams, who was surveilling the area from a van 150 feet from 7007 South Clyde, saw a man fitting the caller's description accompanied by a small child emerge from the entrance to 7007 South Clyde. The man walked directly across the street and entered an apartment building. A few minutes later, he reappeared without the child and returned to 7007 South Clyde. A short while later, the man exited from the building, crossed the street, walked north to the intersection of 70th and Clyde, looked all around, and then started walking south on Clyde. When Officer Williams lost sight of the man, he radioed his observations to all of the other surveillance officers.

■ At approximately 2:00 p.m. Officer Oliver, Sergeant Daniel Brannigan, and Sergeant West observed the man walking towards them after they had heard Officer Williams' radio reports. The man looked all around him "furtively" as he walked, and entered a clothing store at the corner of 71st and Clyde. Officer Oliver waited for the man outside the store, and approached him with his gun drawn and pointed down. Officer Oliver informed the man that he was a police officer and asked him his name. Officer Williams later testified that the man said his name was "Kareem something." Officer Williams then arrested and handcuffed the suspect, who was later identified as Kenneth Towns, also known as Kareem Allahdeem.[1]

Sergeants Brannigan and West drove up and placed the defendant in the back seat of the car. Sergeant Brannigan read Towns his *Miranda* rights, which Towns never asserted. During their search of the defendant, the officers discovered two $100 bills and some keys. The officers then drove Towns approximately one block from his arrest allegedly to minimize the impact of his arrest on the ongoing surveillance. Sergeant Brannigan sat in the back seat of the car and pointed a shotgun at the defendant as he entered the car, but put it to his side as they drove away from the area. Immediately after the defendant entered the car, Sergeant Brannigan placed his hand on the defendant's chest in an attempt to discern whether the defendant was unduly frightened by his arrest. None of the officers physically abused Towns and they did not find him to be frightened or uncooperative.

When they parked about a block away, the officers told the defendant that he had been arrested for a bank robbery and asked him about his involvement in the Illinois Service Federal robbery and for identification. The defendant responded that he was not involved in any robbery, that he was not carrying any identification, and that his identification was in his girlfriend's apartment at 7007 South Clyde. Sergeant Brannigan told the defendant, "You are not going to be released from this car until we determine who you are and what's going on here, because you fit our description of someone who is wanted for a very serious offense, and until we get some intelligent answers, we are going to have to work this out some way." The defendant then suggested that the officers come up to his girlfriend's apartment to see his identification.

The officers drove to the alley behind 7007 South Clyde and entered the second floor apartment through a back door with the defendant's key. After determining

---

1. On appeal, the defendant argues for the first time that under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Officer Oliver lacked a reasonable suspicion that the defendant had engaged in criminal activity sufficient to justify the officer's decision to stop the defendant and ask him his name. Because the defendant did not raise this argument below (except as an alternative analysis of the *arrest* as an excessive *Terry* stop) and the trial judge therefore had no opportunity to consider this claim, the issue is deemed waived on appeal. *United*

States v. Whaley, 830 F.2d 1469, 1475 (7th Cir. 1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *Holleman v. Duckworth*, 700 F.2d 391, 394–95 (7th Cir.), *cert. denied*, 464 U.S. 834, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). Defense counsel has not suggested that there are any "exceptional circumstances where justice demands more flexibility," *International Travelers Cheque Co. v. Bankamerica Corp.*, 660 F.2d 215, 225 (7th Cir.1981), which would justify an exception to the general rule.

that no one else was present, the officers asked the defendant where his identification was, and the defendant said that it was in his luggage in the bedroom. In the bedroom, a piece of open luggage was on the bed and a blue gym bag was on the floor next to a pair of men's gym shoes. The defendant stated that all of the luggage belonged to him. The officers searched the defendant's luggage and the entire apartment from "top to bottom" for a seven-hour period. The handcuffed defendant remained at the apartment during this entire period.

The following items found in the search were admitted into evidence at the trial: 1) a Kansas traffic ticket issued to a Lamont Jackson, who was ticketed while driving the 1988 Lincoln Continental that defendant Crane had rented in California; 2) a small blue vinyl bag similar to the one that defendant Gilkey was photographed with during the bank robbery; 3) an empty ammunition clip that would fit only a .44 caliber magnum semi-automatic pistol known as the "Desert Eagle," one of which was recovered from the hotel room where defendant Crane stayed on the night of the bank robbery; 4) a pair of sunglasses similar to those that defendant Towns allegedly wore during the bank robbery; and 5) several money wrappers that were identical to those that had bound the money that the robbers had taken from the bank.

The police later towed away the Lincoln Continental and, during an inventory search, discovered the following evidence that also was admitted at Towns's trial: 1) the rental car contract that defendant Crane had signed as David Alvin; 2) a blue jacket that was similar to one allegedly worn by defendant Towns during the bank robbery; and 3) a black coat that was similar to the Eisenhower jacket worn by defendant Crane during the robbery. In late January 1988, FBI agents visited the Dunes Motel at 9401 Stoney Island in Chicago and obtained a registration card that indicated that a man named "Alvin David" stayed there on the nights of January 28 and 29, 1988. Owners of the motel identified Crane as Alvin David from a photospread, and testified that Crane was driving a Lincoln automobile with California license plates. The motel owner later went to the room Crane had stayed in and discovered a black ski mask and a loaded .44 caliber magnum semi-automatic "Desert Eagle" pistol between the mattress and the box spring of the bed.

## II. MOTION TO SUPPRESS

### A. Towns's Arrest

Towns initially asserts, as he argued in his unsuccessful pretrial motion to quash and suppress, that probable cause did not exist at the time of his arrest and that all evidence obtained as the fruits of the arrest therefore should have been excluded as evidence. When reviewing a district court's probable cause determinations, we will rely on the court's factual findings unless they are clearly erroneous. *United States v. Price*, 888 F.2d 1206, 1208 (7th Cir.1989); *United States v. Lima*, 819 F.2d 687, 688 (7th Cir.1987). We review the district court's legal determination of probable cause, however, de novo, employing the following standard:

The police have probable cause to arrest an individual where "the facts and circumstances within their knowledge and of which they [have] reasonable trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); . . . . "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). The determination of whether probable cause exists in a given situation involves "the factual, practical considerations of everyday life upon which reasonable, prudent [persons], not legal technicians act." *United States v. Watson*, 587 F.2d 365, 368 (7th Cir.1978), *cert. denied, Davis v. United States*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979).

*Lima,* 819 F.2d at 688 (quoting *United States v. Goudy,* 792 F.2d 664, 668 (7th Cir.1986)); *see also Price,* 888 F.2d at 1208–09.

■ We find that the district court's factual findings were not clearly erroneous and that the officers had probable cause to arrest Towns based on the informant's tip and their corroborating surveillance. In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court discarded the previously-used *Aguilar–Spinelli* "two-prong" test of the reliability of informants' tips and adopted the "totality of circumstances" approach in its stead. *See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Under the *Gates* test, a magistrate who issues a warrant assesses an informant's "veracity," "reliability," and "basis of knowledge" under the totality of the circumstances in determining the value of an informant's report in establishing probable cause. Because "the standards applicable to the factual basis supporting the officer's probable-cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment," *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), we must determine whether the information that the officers possessed at the time of Towns's arrest would have allowed a magistrate to issue an arrest warrant. While under the totality of the circumstances test we still consider the informant's veracity, reliability, and basis of knowledge as important factors, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* 462 U.S. at 232, 103 S.Ct. at 2329.

The factual circumstances in *Gates* are not unlike those present in this case. In *Gates,* the police received the following anonymous letter:

[A] couple in your town … strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Green-

way, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,000.00 worth of drugs in their basement.

They brag about the fact they never have to work, and make their entire living on pushers.

\*　　\*　　\*　　\*　　\*　　\*

*Id.* at 225, 103 S.Ct. at 2325. While surveillance corroborated some of the letter's predictions, the Court noted that "[t]he letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gateses' criminal activities." *Id.* at 227, 103 S.Ct. at 2326. The Court also observed that the couple's subsequent travel was "as suggestive of a pre-arranged drug run, as it is of an ordinary vacation trip." *Id.* at 243, 103 S.Ct. at 2335. The Court nevertheless reversed the Illinois Supreme Court's ruling that probable cause was lacking: "[I]n this case, just as in *Draper* [*v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)], seemingly innocent activity became suspicious in light of the initial tip." *Id.* at 243 n. 13, 103 S.Ct. at 2335 n. 13. The *Gates* Court found that the officers' corroboration of significant aspects of the tip was dispositive: " '[B]ecause an informant is right about some things he is more probably right about other facts'; … including the claims regarding the [defendant's] illegal activity." *Id.* at 244, 103 S.Ct. at 2335 (quoting *Spinelli,* 393 U.S. at 427, 89 S.Ct. at 594. (White, J., concurring)).

In the present case, the district judge correctly found that the informant's tip alone was not sufficient to establish proba-

ble cause to arrest Towns. While a citizen informant is inherently more reliable than the usual police informants who are often mired in some criminal activity themselves, *United States v. Rowell*, 612 F.2d 1176, 1178–79 n. 4 (7th Cir.1980), Officer Oliver had no basis for vouching for his source's reliability because he had never garnered any information from this informant in the past. Nonetheless, a history of reliability is not the only method for assessing whether a source is reliable in a particular instance; independent police work that corroborates the information received can confirm the informant's reliability. *See United States v. Reyes*, 792 F.2d 536, 539 (5th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986); *United States v. Phillips*, 727 F.2d 392, 396 (5th Cir.1984). Officer Oliver verified the informant's allegation that one of the bank robbers was staying in the area of 70th and Clyde by checking the phone number that the caller said was to the apartment where Kareem was staying. The number was registered to an apartment in a building at 7007 South Clyde from which a man who fit the description of Kareem emerged and reentered on the day after the bank robbery. Oliver also determined that three black males had robbed a bank on the date and at the same location that the informant had mentioned. The informant had stated that the woman Kareem was staying with was the mother of his child and that the informant had first seen Kareem in the apartment building across the street from where the mother and her child lived. Surveillance corroborated this aspect of the informant's report when the officers observed Kareem walk a young girl from the building where he was allegedly staying to a building directly across the street. The officers also discovered an automobile parked within a block of the suspect's residence that fit the informant's description of the brigands' automobile, a Lincoln Continental with California license plates. The vehicle also fit the description of the car that eyewitnesses reported seeing at the robbery as the getaway car, which Officer Oliver knew because he had checked the police report concerning the robbery before beginning surveillance.

While the veracity and reliability of the informant had to be established from police corroboration of the informant's tip, the informant's basis of knowledge was strong. The Supreme Court noted in *Gates* that even if an informant's motives are questionable, an strong demonstration of a basis of knowledge may remedy a weak showing of reliability. *Gates*, 462 U.S. at 234–35, 103 S.Ct. at 2330. The informant's statement in this case demonstrated a clear basis of knowledge. The caller explained that the same day as the robbery she had been in a friend's apartment with the culprits, had seen their guns, had overheard Kareem and two other men discussing the bank robbery at 87th Street and King Drive, and heard them state that the money was in a bag. The informant also stated that she had seen the three men driving a Lincoln Continental with California license plates. The informant's basis of knowledge could only have been stronger if she personally had observed the robbery or had been a victim of the crime.

When Towns exited the building at 7007 South Clyde for a second time, he crossed the street, walked north to the intersection of 70th and Clyde, looked around furtively at the intersection, and turned around and started walking south on Clyde. Towns eventually walked into a clothing store at the corner of 70th and Clyde. While this activity appears entirely innocuous in isolation, we must consider it "not in isolation but in the perspective of all the circumstances known" to the officers. *United States v. Colonia*, 870 F.2d 1319, 1323–24 (7th Cir.1989). As to all of the police observations of Towns's activity, "[t]he relevant inquiry is not whether specific conduct is innocent or guilty, but the level of suspicion attaching to particular kinds of noncriminal acts." *Id.* at 1323. Towns's behavior is consistent with that of a suspect wary of being observed. When Officer Oliver subsequently approached Towns, asked him his name, and learned it was Kareem, he had probable cause under the totality of circumstances to believe that this was the suspect identified by the infor-

mant who had robbed the bank the previous day.

B. *The Search of Cecile Jackson's Apartment*

 The fourth amendment generally prohibits the warrantless entry of a person's home, either to make an arrest or to conduct a search. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). An exception to this general proscription arises, however, when voluntary consent to search has been given either by the individual whose property is searched, *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), or by a third party having common authority over the premises, *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). In *Matlock,* the Supreme Court stated that "common authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes...." 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. The Supreme Court has recently held that a warrantless entry is valid even when it is based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not. *Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

While the burden of establishing common authority rests on the state, *Rodriguez,* 110 S.Ct. at 2797, the record clearly indicates that this burden was sustained, and neither the defendant nor Ms. Jackson dispute the trial court's implicit finding that Towns had authority to consent to a search. On appeal, Towns argues that he never consented to the search, and if his behavior is construed as consent, such consent was not freely and voluntarily given. The analysis of the government, the defendant, and the trial court centered upon the voluntariness of any consent to search. It is apparent upon a review of the record, however, that the police never requested permission to search and such consent was

never given. Rather, Towns merely suggested that the officers return to Cecile Jackson's apartment where he had left his identification, which the police erroneously interpreted as consent to a seven-hour search of the apartment.

At the hearing on Towns's suppression motion, neither Officer Oliver nor Officer Brannigan, who were government witnesses, stated that they requested Towns's permission to search the apartment or that he granted them such permission. Officer Oliver was unable to recall if any items of evidentiary value were in plain view, and Officer Brannigan did not testify when during the seven-hour search several of the disputed items of evidence were recovered. Officer Oliver conceded at the suppression hearing, and the government conceded at oral argument before this court, that the police officers searched the apartment from "top to bottom" without ever troubling themselves to obtain a search warrant or to ask the defendant if they could conduct a general search. Neither the police report, which was defendant's exhibit at the hearing, nor any of the testimony of the arresting officers indicates when during the course of the concededly illegal seven-hour search the disputed items of evidence were discovered. The government argues that the evidence was conveniently discovered in plain view prior to the "illegal" extensive search, while either the defendant or the officers were rummaging through the defendant's luggage in search of identification. Nonetheless, neither of the officers so testified during the suppression hearing and the only certainty is that the government engaged in a patently improper search of the entire apartment during which they discovered the incriminating evidence.

We must affirm a district court's factual finding that a defendant voluntarily consented to a search unless that finding is clearly erroneous. *United States v. $73,277, United States Currency,* 710 F.2d 283, 291 (7th Cir.1983). In this case, there is a dearth of evidence, other than the government's bare suggestion, that the defendant consented to a search. The district

court could readily find that the defendant allowed the police to enter the apartment so that he could provide them with some identification, but there is no evidence that he also invited them to search through his belongings and later conduct an exploratory search of the apartment for a seven-hour period. Even when a defendant consents to a search in response to a police inquiry, the scope of the search is limited by the breadth of the consent. *United States v. Garcia*, 897 F.2d 1413, 1419 (7th Cir.1990). In this case it is not only evident that the defendant never expressly consented to a search, it is also unclear from the record when each of the disputed items was found during the wide-ranging search. We therefore find that the district court's ruling that the defendant had consented to a search of Cecile Jackson's apartment is clearly erroneous.

### III. MOTION TO DISQUALIFY

Prior to trial, Towns filed a motion to disqualify the trial judge pursuant to 28 U.S.C. § 455(a), alleging that Judge Holderman should disqualify himself due to an appearance of impropriety. The defendant alleged that one might reasonably question the judge's impartiality because in the course of denying the defendant's motion for review and revocation of the order of detention, Judge Holderman viewed some of the bank surveillance camera photographs and stated that he was "convinced" that the defendant was depicted in the photos.

As defendant concedes, this court has consistently held that to preserve a recusal motion under section 455(a), a defendant must immediately move for a writ of mandamus in the event the district judge denies his motion. *See United States v. Sidener*, 876 F.2d 1334, 1336 (7th Cir.1989); *Matter of Nat'l Union Fire Ins. Co.*, 839 F.2d 1226, 1227 (7th Cir.1988); *United States v. Balistrieri*, 779 F.2d 1191, 1205 (7th Cir. 1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). Failure to so move results in waiver of the recusal argument. *Sidener*, 876 F.2d at 1336; *Matter of Nat'l Union Fire Ins. Co.*, 839 F.2d at 1227; *Balistrieri*, 779 F.2d at 1205.

To avoid his waiver of the recusal argument under section 455(a), Towns now disingenuously states that his earlier recusal motion, which clearly invoked only section 455(a), was really a motion pursuant to 28 U.S.C. § 144 for recusal because of *actual* bias of the trial judge. A trial judge's denial of a section 144 recusal motion, unlike a denial of a section 455(a) motion, may be reviewed on appeal. *See Balistrieri*, 779 F.2d at 1199. Nonetheless, section 144 requires the movant to file a timely affidavit stating the facts and reasons for the belief that the trial judge is prejudiced. Towns never filed an affidavit supporting his recusal motion. Towns's failure to file a "timely and sufficient" affidavit precludes us from considering a claim of actual bias under section 144 due to the defendant's failure to properly raise it below. *See United States v. de la Fuente*, 548 F.2d 528, 541 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977); *Galella v. Onassis*, 487 F.2d 986, 997 (2d Cir.1973).

### IV. JURY INSTRUCTION CONCERNING ABSENCE OF CODEFENDANTS

A jury was initially selected and impaneled in this case for the joint trial of Towns and his codefendants Crane and Gilkey. Prior to opening statements, Crane and Gilkey pleaded guilty. Towns then moved for a mistrial. Judge Holderman denied the motion and instead gave the jury the following cautionary instruction:

Yesterday I informed you at the beginning of the jury selection process that each Defendant is entitled to separate consideration. In order to allow for separate consideration of each Defendant, we are going to proceed with the trial with regard to the Defendant Kenneth Towns. The cases of the other two Defendants who were present yesterday are to be considered at another time, and your sole consideration will be with regard to whether the Government has proven its case—at the end of the case—with regard to whether the Government

has proven its case beyond a reasonable doubt as to the Defendant Kenneth Towns.

At the conclusion of the trial, the district judge also instructed the jury as to the presumption of innocence and the assessment of credibility. Towns now argues that because we have earlier acknowledged a jury instruction regarding the absence of a codefendant as "exemplary," a district judge must not deviate in any way from this approved instruction when admonishing the jury regarding the absent codefendants.

In *United States v. Barrientos*, 758 F.2d 1152, 1156–57 (7th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986), we stated that whenever a codefendant leaves a case in mid-trial, the trial judge should acknowledge his absence to the jury and instruct them that his absence should not affect their deliberations concerning the remaining defendants. We approved and recommended the following jury instruction given in *United States v. Phillips*, 640 F.2d 87, 90–91 (7th Cir.), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981):

> Ladies and gentlemen of the jury, I'm going to give you a cautionary instruction in regard to the absence of [the defendant].
>
> One of the defendants who started this trial is no longer a part of the trial. For legally sufficient reasons, which I'm not going to go into at this time, he is no longer a part of this trial. I instruct you that is not and should not be of concern to you in dealing with the question of the guilt or innocence of [the remaining defendant]. And you are not to speculate as to the absence of or why the other defendant is no longer standing trial. And his absence should not control or influence your verdict in any way whatsoever with respect to the defendant who is still here.
>
> The reason for this is even when defendants are tried jointly, the jury is called upon to determine the guilt or the innocence of each defendant separately and the jury will be called upon, even if they are joint defendants, to consider the evidence separately as to one defendant and then as to the next defendant. And that the purpose of a joint trial is not to implicate one defendant with the other, it's just a matter of convenience. It amounts to saving court time.
>
> The fact that we have only one defendant left in this trial should be of no concern to you because whatever your verdict is, if you do reach a verdict, it has to be based solely upon the evidence that's received in this courtroom as it relates to that defendant.
>
> I want to emphasize again that the remaining defendant has entered a plea of not guilty and he has therefore denied each and every essential element of the crimes charged. And that the government has a burden of proof beyond a reasonable doubt. This burden is still with the government and never shifts to the defendant.

We still find the *Phillips* instruction to be exemplary and advise district judges to include it in their repertoire of curative jury instructions. Nonetheless, our earlier description of the *Phillips* instruction as "exemplary" denoted that the instruction was worthy of imitation and that it effectively informed "the jury of the co-defendant's absence but not the reason for his absence, and instruct[ed] them on their duty to determine separately the guilt or innocence of each defendant. This instruction focuse[d] on the jury's task at hand." *Barrientos*, 758 F.2d at 1156.

The jury instruction at issue in this case adequately informed the jury of the codefendants' absence and directed the jury to focus their energies solely on the determination of Towns's guilt or innocence. Furthermore, the judge's general instructions as to the presumption of innocence and assessment of credibility adequately protected the defendant from prejudice in his trial.[2]

---

**2.** In an attempt to bolster his claim of prejudice, Towns claims that "[d]uring the course of the

proceedings for which the defendant Shabazz [Gilkey] was before the jury, he exhibited a

### V. IDENTIFICATION TESTIMONY

■ At Towns's trial, the district judge allowed Cecile Jackson, Towns's former girlfriend, to identify defendant Towns as one of the men pictured in some of the bank surveillance camera photographs. Defendant claims that Cecile Jackson's identification testimony was improper under Federal Rule of Evidence 701.

Under Federal Rule of Evidence 701, a court may admit opinion evidence by a lay witness where the witness' opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." A district judge's decision whether to admit testimony under Rule 701 is "committed to the sound discretion of the district court and a ruling will not be reversed absent a finding that the trial court abused its discretion." *Kelsay v. Consolidated Rail Corp.*, 749 F.2d 437, 448 (7th Cir.1984) (citation omitted).

Generally, a lay witness may testify regarding the identity of a person depicted in a surveillance photograph "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir.1984). Lay witness opinion testimony is particularly appropriate when the witness was familiar with the defendant at the time of the crime and the defendant's appearance has changed by the time of trial. *See id.; United States v. Barrett*, 703 F.2d 1076, 1086 (9th Cir.1983); *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 222 (1980). Towns contends that lay witness opinion testimony concerning an identification is only admissible when the defendant has *significantly* altered his appearance since the time of his crime.

In *United States v. Jackson*, 688 F.2d 1121 (7th Cir.1982), *cert. denied*, 460 U.S. 1043, 103 S.Ct. 1441, 75 L.Ed.2d 797 (1983), we rejected an argument identical to the one Towns now advances. The district court in *Jackson* allowed a witness who had met the defendant on only one prior occasion a year before a bank robbery to identify the defendant as one of the bank robbers depicted in a surveillance camera photograph. We affirmed the district court's decision to allow the witness to testify in *Jackson*, despite the absence of independent evidence that the defendant had changed his appearance, because the witness's testimony was "*helpful* to a clear understanding of ... the determination of a fact in issue." FED.R.EVID. 701(b).

Towns's case presents a more compelling use of lay witness identification testimony, for, as the trial court noted, Towns had a moustache at the time of the robbery that he had shaved off prior to trial. Moreover, the robber depicted in the photograph was wearing a stocking cap, sunglasses, and a sweatsuit that potentially made him appear heavier than he really was. Because Cecile Jackson had a close association with Towns and had observed his appearance on the day of the bank robbery, her testimony would be particularly helpful to the jury's determination of whether Towns was the bank robber in the photograph. In admitting Cecile Jackson's identification testimony under FED.R.EVID. 701, the trial judge acted well within his discretion.

### VI. ADMISSION OF THE GUN AND THE SKI MASK

■ During the course of the trial the district judge admitted into evidence the ski mask and the .44 caliber semi-automatic pistol that were found after the robbery at

---

manner of protest by refusing to acknowledge the court or the jury, keeping his eyes closed and his chin to his chest." Nonetheless, Towns's counsel did not cite Gilkey's curious impertinence when moving for a mistrial and there is nothing in the record indicating that Gilkey acted in an unusual manner in the jury's presence. Defense counsel's statement in her brief that she moved for severance before trial due to

Gilkey's conduct is belied by the record. The only severance motion filed on Towns's behalf was premised on Towns's desire to proceed quickly to trial and his belief that his codefendants' lack of preparedness would frustrate this wish. In all events, we find that the trial judge's curative instruction neutralized any prejudice Towns might have suffered due to the midtrial absence of his codefendants.

the Dunes Motel and allowed the government to argue that both items had been used in the bank robbery. Towns argues that this evidence was more prejudicial than probative and should therefore have been excluded under FED.R.EVID. 403.

We will not reverse a trial court's evidentiary ruling unless a defendant shows that the ruling was a clear abuse of discretion. *United States v. Sababu*, 891 F.2d 1308, 1330 (7th Cir.1989); *Davis v. Lane*, 814 F.2d 397, 399 (7th Cir.1987). This court has noted that "the trial court's assessment of relative probative value and unfair influence is generally accorded great deference because of his firsthand exposure to the evidence and his familiarity with the course of the trial proceeding." *United States v. Levy*, 741 F.2d 915, 924 (7th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984); *see also Sababu*, 891 F.2d at 1330.

Although it is indisputable that this evidence incriminated defendant Crane, who had stayed in the hotel room where the items were found, more than defendant Towns, this does not denote that the items did not incriminate and were not admissible against Towns. Greg Brown, a bank employee, testified that defendant Crane was carrying a large, black automatic pistol, and that the gun recovered at the Dunes Motel was the "type of weapon" that Crane was carrying. The security guard at the bank testified that during the course of the robbery Crane wore a ski mask, which the surveillance camera photographs substantiated. The owners of the Dunes Motel testified that Crane stayed in room 123 on the night of the robbery and the following night. The gun and the ski mask were found between the mattress and box spring of the bed in room 123 shortly after Crane checked out. Witnesses at Towns's trial identified both Crane and Towns as participants in the bank robbery, and the Lincoln automobile that Crane had with him at the Dunes Motel was found one block from the apartment where Towns stayed on the night of the robbery. Moreover, Towns was seen with Crane both before and immediately after the robbery.

We find that the gun and the ski mask were relevant, admissible evidence against Towns. Both were alleged instrumentalities in the bank robbery and tended to make the government's allegation that Towns and Crane conspired to rob the bank and succeeded in doing so more probable. Nor are we convinced that the disputed evidence's probative value was outweighed by unfair prejudice contrary to Rule 403 of the Federal Rules of Evidence. The district judge reduced any unfairness that might have devolved upon Towns by explicitly instructing the jury that as to the bank robbery, the gun and the ski mask were admitted into evidence for the limited demonstrative purpose of providing examples of the gun and ski mask that were actually used in the robbery. While the gun was admitted as substantive evidence of what was found during the search at the Dunes Motel, the judge refused to allow the gun or the ski mask to go back to the jury during their deliberations. Because both the ski mask and the gun were admitted into evidence, appeared in the bank surveillance photographs, and were identified by eyewitnesses as being similar to those possessed by the robbers, the government could argue, and the jury could infer, that both had been used during the robbery. In sum, we find that the trial judge did not abuse his broad discretion regarding the admission of the gun and the ski mask into evidence.

## VII. ADMISSION OF EVIDENCE OBTAINED FROM THE UNLAWFUL SEARCH WAS NOT HARMLESS ERROR

In determining whether a constitutional error was harmless, the Supreme Court stated that " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). The government bears the burden of proving beyond a reasonable doubt that the admission of the evidence recovered from the search was harmless. *See id.* 386 U.S. at

24, 87 S.Ct. at 828; *United States v. Napue*, 834 F.2d 1311, 1328 (7th Cir.1987).

There is no doubt that in this case there is a reasonable probability that the evidence obtained in the search of the apartment might have contributed to the conviction. The government characterized the money wrappers as its "favorite" piece of evidence because they were "the type of money strips that [were] used in the savings and loan that was robbed." The .44 caliber magazine clip, which would only fit the .44 caliber magnum semi-automatic Desert Eagle weapon found in the hotel room used by Towns's alleged co-conspirators, undoubtedly provided a formidable link between Towns and his purported cohorts. The government's insistent statement to the jury that the recovered sunglasses "were the same sunglasses" that one of the men in the surveillance photographs was wearing emphasized the incriminating nature of the recovered evidence. In a case where none of the bank employees could identify the defendant and none of his purported colleagues testified as to Towns's involvement in the robbery, the incriminating nature of the items found in Cecile Jackson's apartment, as well as their importance to the government's case, is enhanced. We therefore find that there is a reasonable probability that the items recovered during the search of Cecile Jackson's apartment contributed to Towns's conviction and that Towns is entitled to a new trial.

## VIII. CONCLUSION

In summary, the rulings of the district court are affirmed in all respects with the exception of the ruling on Towns's motion to suppress, which is affirmed with respect to the arrest but reversed with respect to the search of the apartment. We hold that the government has failed to prove that the constitutional error was harmless beyond a reasonable doubt. We therefore REVERSE appellant's convictions on all counts and remand for a new trial.