Walter E. **EDWARDS**

v.

Veronica **CABRERA** and
Harry T. Redmond.

No. 93 C 945.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 10, 1994.

Gregory E. Kulis, Law Offices of Gregory E. Kulis, Chicago, IL, for plaintiff.

Jeffrey Edward Schiller, Mary A. Kerr, Michael F. Braun, Schuyler, Roche & Zwirner, Chicago, IL, Barbara M. Meyer, Village of Skokie Law Dept., Corp. Counsel, Skokie, IL, Mark S. Stein, Village of Skokie, Skokie, IL, for defendants.

### MEMORANDUM OPINION

GRADY, District Judge.

Before the court are plaintiff's motion for summary judgment and defendants' cross-motions for summary judgment. For the reasons stated in this opinion, plaintiff's motion will be granted as to Count I and denied as to Count II, and defendants' cross motions will be denied.

### BACKGROUND

In this lawsuit, plaintiff Walter Edwards charges in Count I that defendant Skokie

Police Officers Veronica Cabrera and Harry T. Redmond are liable to him under 42 U.S.C. § 1983 for wrongly detaining him for investigation and then wrongly arresting him, in violation of the Fourth and Fourteenth Amendments to the Constitution. Count II alleges a state claim for false imprisonment by both defendants. Except where noted, the facts are undisputed.

On the evening of May 13, 1992, the Skokie Police Department received a call from a dispatcher for PACE, a public bus transit agency. The dispatcher reported that an unnamed PACE bus driver had thought he had seen a drug transaction involving five black men at the Greyhound bus station in Skokie. Defendant Cabrera, a Skokie police officer, arrived at the bus station within about three minutes.

When she arrived, Cabrera saw four black men standing together outside the bus station. One of them was the plaintiff's brother, Eugene Edwards. Another was the plaintiff, Walter Edwards. Eugene boarded a Greyhound bus, and Walter walked toward a parked car. As Walter walked toward the car, Cabrera approached him and asked him if she could talk to him. Walter complied, although he maintains that Cabrera spoke in "an ordering tone" that made him feel compelled to answer Cabrera's questions. (Cabrera maintains that she simply asked to speak with Walter.) Walter told Cabrera that Eugene was his brother and had boarded the bus to go home to Forest City, Arkansas. Cabrera then asked Walter to accompany him to the bus; the parties again dispute whether she did so in a coercive manner. Walter complied.

Cabrera, who was in uniform, stepped aboard the bus and asked Eugene, by name, to step off. He did so. Cabrera then asked both Walter and Eugene for identification. Around this time, defendant Redmond arrived at the scene in his marked police car. After Eugene fetched a garment bag and produced his identification, Cabrera and Redmond noticed a large wet spot on the front of Eugene's pants. Cabrera assumed that he had urinated in his pants from being nervous, and Redmond recalled in his deposition testimony that Eugene told him he had

been unable to get to a bathroom. As Redmond and Cabrera spoke with Eugene and Walter Edwards, a third Skokie police officer arrived and questioned two black men and a black woman who were standing against a wall at the bus station.

Meanwhile, Cabrera asked Eugene if she could look in the bag. The parties dispute whether Eugene clearly consented to the request, but Cabrera went ahead and searched the bag. Inside Eugene's bag, Cabrera found two self-sealing plastic bags containing an unspecified amount of a substance that appeared to be marijuana.

Cabrera and Redmond arrested Eugene. But in an action with particular significance to this case, they also arrested his brother Walter, the plaintiff. Walter and Eugene were transported in Redmond's car to the Skokie police station, but Walter was released an unspecified time later without being charged.

Walter alleges in Count I and in his summary judgment motion that Cabrera and Redmond violated his constitutional rights in two respects. First, he alleges that when Cabrera first approached him on his way back to his car, her initial questioning of him was an improper investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Second, he alleges that his arrest by Cabrera and Redmond was without probable cause, in violation of his Fourth Amendment right against unreasonable seizure.

In their cross motions for summary judgment, the officers argue that Cabrera's initial questioning of Walter Edwards was fully consensual and thus need not have met the requirements of *Terry*, which defendants say was complied with in any event. As to Walter's arrest, they argue they had sufficient probable cause. The defendants also assert the defense of qualified immunity as to both components of Walter Edwards' claim in Count I. As to Count II, they argue they are immune from the state tort claim under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1–101 *et seq.*

## ANALYSIS

### I. The Applicable Legal Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co.*, 883 F.2d 569, 573 (7th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. City of Chicago*, 789 F.2d 534, 536 (7th Cir.1986). In other words, although the district court's role on summary judgment is not to sift through the evidence and decide whom to believe, the court will enter summary judgment against a party who does not come forward with evidence that would reasonably permit a finder of fact to find in his or her favor on a material question. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Walter Edwards brings this lawsuit under 42 U.S.C. § 1983, which states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish a prima facie case for a violation of § 1983, a plaintiff must plead and prove: (1) the deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254, 101 L.Ed.2d 40 (1988).

The question of whether the prima facie case under § 1983 also requires some showing as to the defendant's culpable state of mind has been the source of some confusion among scholars and judges. *See* Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 3.01 at 136–141 (3d ed. 1991). The proper view is that no state of mind requirement exists independent from the required inquiry under § 1983 into whether plaintiff can establish that a constitutional violation occurred. In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the United States Supreme Court noted that "[n]othing in the language of § 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights." *Id.* 451 U.S. at 534, 101 S.Ct. at 1912. Therefore a negligent deprivation of a constitutional right is actionable under § 1983. *Id.; McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391 (7th Cir.1984); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1238 (7th Cir.1984). The important distinction here is between a constitutional deprivation that happens to be negligent, and a negligent act that is not a constitutional deprivation because the applicable constitutional provision is not violated by mere negligence. Once the § 1983 plaintiff establishes that the defendant committed a constitutional deprivation, the plaintiff need not show that the defendant acted with any particular state of mind. But in § 1983 cases predicated on certain constitutional provisions, the plaintiff will not be able to establish that a constitutional deprivation took place unless the plaintiff can show that the defendant's conduct went beyond negligence.

The Supreme Court's decision in *Parratt* was overruled in part on this precise distinction. *Daniels*, 474 U.S. at 330–31, 106 S.Ct. at 664–65. The *Daniels* and *Parratt* cases

both involved § 1983 claims in which prisoners alleged deprivations of due process. In *Parratt,* the petitioner's jailers lost a hobby kit he had ordered through the mail. In *Daniels,* the petitioner hurt himself when he slipped on a pillow that his jailers had left on the stairs. *Daniels* held that *Parratt* went too far in ruling that negligence by state actors could ever give rise to a claim for violation of due process, which historically had been interpreted to prohibit deliberate or arbitrary government conduct. *Daniels,* 474 U.S. at 330–31, 106 S.Ct. at 664–65. But *Daniels* did not take issue with the portion of *Parratt* stating that a plaintiff states a claim under § 1983 by (1) alleging a constitutional deprivation (2) by a person acting under color of state law. *See West,* 487 U.S. at 48, 108 S.Ct. at 2254. *Daniels* simply held that in a § 1983 case predicated on a deprivation of due process, the plaintiff cannot clear the first hurdle of the prima facie case by alleging mere negligence. The Court in *Daniels* explicitly stated that "we need not rule out the possibility that there are other constitutional provisions that would be violated by mere lack of care in order to hold, as we do, that such conduct does not implicate the Due Process Clause of the Fourteenth Amendment." *Id.* 474 U.S. at 334, 106 S.Ct. at 666.

In § 1983 claims by convicted prisoners for violations of the Eighth Amendment and by pretrial detainees for violations of the Fourteenth Amendment, federal courts similarly have held that prisoners who are negligently subjected to some indignity cannot hold prison or jail officials liable under § 1983 because the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment applicable to pretrial detainees are violated only by deliberate acts or deliberate indifference to the prisoners' suffering. *See Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992) (Fourteenth Amendment); *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992) (Eighth Amendment). These cases show how a court's inquiry into a § 1983 defendant's subjective state of mind is folded into the inquiry into whether the plaintiff actually has suffered a constitutional violation, and not whether state of mind is a defense to the violation, once established. *See Wade v. Hegner,* 804 F.2d 67, 69–70 (7th Cir.1986).

Therefore, this court must inquire into whether a Fourth Amendment violation requires any particular mental state on the part of the offending officer. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In cases involving seizures of persons, there is little doubt that a Fourth Amendment violation at least requires the officer's intentional act of terminating the person's freedom of movement. *See Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381–82, 103 L.Ed.2d 628 (1989) (stating that Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied"). But this intent requirement applies to whether a seizure has occurred. For example, a police officer has not made a seizure for Fourth Amendment purposes by unintentionally crashing a squad car into the plaintiff, *Apodaca v. Rio Arriba County Sheriff's Dep't,* 905 F.2d 1445, 1447 (10th Cir.1990), but an intentional crash would constitute a Fourth Amendment seizure. *Adams v. St. Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1570 (11th Cir.1992), *rev'd on other grounds,* 998 F.2d 923 (11th Cir.1993).

■■■ Once a court determines that a Fourth Amendment "seizure" has taken place, the analysis must turn to whether the seizure was "reasonable." *Pliska v. City of Stevens Point,* 823 F.2d 1168, 1176 (7th Cir. 1987). The reasonableness analysis has never entailed an examination of the officer's state of mind or intent. The reasonableness of a search or seizure is judged by an objective standard, *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), or whether the officer's acts were "objectively reasonable" in light of the facts and circumstances confronting the officer. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). This reasonableness determination reflects " 'a careful balancing of governmental and private interests.' " *Soldal v. Cook County,* —— U.S. ——, ——, 113 S.Ct. 538, 549, 121 L.Ed.2d 450 (1992) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985)). "What matters is the intrusion

on the people's security from government interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house were undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, *or on a whim, for no reason at all.*" *Soldal,* —— U.S. at ——, 113 S.Ct. at 548 (emphasis added); *see also Graham,* 490 U.S. at 397, 109 S.Ct. at 1872 (stating in Fourth Amendment use of force case that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional"). Applying *Graham* to a § 1983 claim alleging unlawful arrest, the Ninth Circuit held that it was error to instruct the jury that the plaintiff had to show the defendant officer specifically intended to violate the plaintiff's Fourth Amendment rights. *Caballero v. City of Concord,* 956 F.2d 204, 206 (9th Cir.1992). So although a violation of the Fourth Amendment is no less a deprivation if done negligently, the question of the officer's "objective good faith" will come into play during the later stage of the analysis when the court determines whether a remedy is available for the deprivation, i.e. whether the officer may assert the defense of qualified immunity. *Specht v. Jensen,* 832 F.2d 1516, 1523 (10th Cir.1987), *remanded on other grounds,* 853 F.2d 805 (1988) (en banc), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989). The officer's subjective good faith is relevant only if it concerns one of the substantive elements of the constitutional wrong, but it will always be irrelevant to the objective inquiry of qualified immunity. *See Elliott v. Thomas,* 937 F.2d 338, 344 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992).

 ▮▮▮  Once a § 1983 plaintiff establishes the prima facie case, a defendant public official may plead qualified immunity as an affirmative defense. However, courts should analyze qualified immunity only after resolving the "purely legal question" of whether the plaintiff has established a violation of a constitutional right. *Sivard v. Pulaski County,* 17 F.3d 185, 189 (7th Cir.1994). Qualified immunity is a judicially created doctrine that

stems from the conclusion that few persons would enter public service if they would incur personal liability for their reasonable decisions. *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430 (7th Cir.1989), *cert. denied,* 498 U.S. 949, 111 S.Ct. 368, 112 L.Ed.2d 331 (1990). Qualified immunity generally shields government officials from civil liability arising from their performance of discretionary functions to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Biddle v. Martin,* 992 F.2d 673, 675 (7th Cir.1993) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Whether an official is entitled to qualified immunity on the facts, it is a question of law for the court. *Rakovich v. Wade,* 850 F.2d 1180, 1201 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

In this case, the parties do not dispute that Walter Edwards had a clearly established constitutional right against being detained without reasonable suspicion and being arrested without probable cause. Defendants dispute that their acts deprived Edwards of his Fourth Amendment rights and argue that even if they did, defendants are entitled to qualified immunity.

## II. Cabrera's Initial Questioning of Walter Edwards

Defendants argue that when Walter Edwards was questioned near his parked car and near the bus, he was never subjected to anything more than a consensual encounter with the police. Edwards argues that the questioning constituted an investigative detention, for which the necessary reasonable articulable suspicion was lacking.

 ▮▮▮  In what has become known as a *Terry* stop, a police officer may briefly detain a person for investigation if the officer has a "reasonable articulable suspicion" of criminal activity. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81. The *Terry* stop is a Fourth Amendment "seizure," but if the officer simply seeks a person's voluntary cooperation through noncoercive questioning, the police-

citizen encounter is consensual and does not implicate the Fourth Amendment. *United States v. Adebayo,* 985 F.2d 1333, 1337–38 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993). In such a consensual encounter, " 'the degree of suspicion that is required is zero.' " *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990) (quoting *United States v. Serna–Barreto,* 842 F.2d 965, 966 (7th Cir.1988)). In determining whether a police-citizen encounter is consensual, the Seventh Circuit considers several factors:

—whether the encounter occurred in a public or private place;

—whether the person consented to talk with the law enforcement agents;

—whether the agents informed the person that he was not under arrest and was free to leave;

—whether the agents removed the person to another area;

—the threatening presence of several officers;

—the display of a weapon by an officer; and

—some physical touching of the person.

*Adebayo,* 985 F.2d at 1338.

■ According to Walter Edwards' own testimony, Cabrera approached him at the public bus station and asked, "Could I talk to you for a minute?" Edwards then consented to talk to her. Defendant's Rule 12(n) Statement, Exh. A at 32. Cabrera was by herself at first, her service weapon was holstered, and she did not yell at or frisk Edwards. *Id.* at 32–33. Walter Edwards also recalled that after asking him a couple of questions about his brother Eugene, Cabrera then asked, "Do you mind stepping back to the bus with me?" *Id.* at 34. By this time, two other officers had arrived, but only one of them, Redmond, was involved in the questioning of the Edwards brothers outside the bus. Walter Edwards does not allege that Cabrera or Red-

mond ever touched him at this point in their encounter. The evidence does not include facts showing that during this initial questioning, Cabrera ever told him he was free to leave, but a consideration of all of the above factors strongly indicates that the initial questioning was no more than a consensual encounter. Walter Edwards argues that it was not consensual because: (1) Cabrera asked him to accompany her to the bus, in addition to asking him questions, and (2) he believed he had to comply.

■ Plaintiff's argument that Cabrera's request that he accompany her to "another location" [1] converted the encounter into a *Terry* stop has no merit. The undisputed facts show that the bus was about 20 or 25 feet from where Cabrera first approached Walter Edwards. Defendant's Rule 12(n) Statement, Exh. A. at 33. This is hardly "another location." Cabrera's request that he follow her to the bus was no more coercive than her request to ask him a few questions. It does not add any legal weight to Edwards' testimony that he subjectively felt compelled to comply with the officer's requests. The test remains whether a reasonable person would believe he was at liberty to disregard the officer's request.[2] *Edwards,* 898 F.2d at 1276. In the absence of any evidence of coercion by Cabrera at this stage of the encounter, this court finds no genuine issue of fact as to whether a reasonable person would have felt free to decline her requests and to leave. *Id.*

Because a consensual police-citizen encounter is not a seizure and does not implicate the Fourth Amendment, Edwards has failed to meet the first prong of the § 1983 prima facie case. He has failed to present a genuine issue of fact as to whether Cabrera's initial questioning of him actually amounted to a constitutional violation. Therefore Cabrera is entitled to summary judgment on this component of Count I, and the court

---

1. *See* Plaintiff's Memorandum in Support of His Reply to Defendant Cabrera's Response, at 4.

2. In this sense, Cabrera's testimony that she considered the questioning an "investigatory stop" is irrelevant. If an officer's acts were deemed coercive every time he or she intended to question a person for investigatory purposes, almost any police-citizen encounter would have to be analyzed as a *Terry* stop, even if the officer did no more than ask for the citizen's voluntary cooperation.

need not consider defendants' qualified immunity argument as to this issue.

Defendant Redmond also is entitled to summary judgment on this issue. Plaintiff does not dispute that Redmond was not yet present at the bus station when the bulk of the encounter occurred. Therefore there is no genuine issue of fact as to whether Cabrera's initial questioning of Walter Edwards could be construed as a constitutional deprivation by Redmond. Even if there were a genuine dispute over whether Redmond was present, or even if he were undoubtedly present, he would be entitled to summary judgment for the same reasons as is Cabrera. The undisputed facts show that Walter Edwards' constitutional rights were not violated at this stage of his encounter with Cabrera and Redmond.

### III. Walter Edwards' Arrest by Cabrera and Redmond

The subsequent arrest of Walter Edwards entails roughly the same inquiry: Is there a genuine issue of fact as to whether Edwards suffered a constitutional violation at the defendants' hands, and if so, are the officers entitled to qualified immunity? Defendants do not dispute that they arrested Walter Edwards, or that the arrest was a "seizure" for purposes of the Fourth Amendment. Instead, they argue that the arrest was reasonable because it was supported by probable cause, and that if it was not supported by probable cause, qualified immunity applies because a reasonable officer could have believed there was probable cause.

### A. The Arrest Was Without Probable Cause

Probable cause is "a fluid concept" that turns on the assessment of particular factual contexts, rather than a set of overarching legal rules. *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). In general, probable cause to arrest exists when the officer has, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in themselves to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). Where the facts and circumstances involve a tip from an informant, the tip may be the basis of probable cause if the officer reasonably corroborates it. *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). The probable cause determination must be informed by an analysis of the totality of the circumstances, including the "veracity," "reliability" and "basis of knowledge" of informants. *Gates,* 462 U.S. at 233, 238, 103 S.Ct. at 2329, 2332. The totality-of-the-circumstances analysis allows a deficiency in any of these areas to be compensated for, in determining the overall reliability of a tip, by a strong showing as to another, or by some other indicia of reliability. *Id.* at 233, 103 S.Ct. at 2329. "It is enough, for purposes of assessing probable cause, that '[c]orroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" *Id.* at 244–45, 103 S.Ct. at 2335 (quoting *Jones,* 362 U.S. at 269, 271, 80 S.Ct. at 735, 736). The courts ordinarily require greater corroboration where the tip is of low reliability, and lesser corroboration where it is of proven reliability. *Alabama v. White,* 496 U.S. 325, 330–32, 110 S.Ct. 2412, 2416–17, 110 L.Ed.2d 301 (1990). *White* also suggested that an informant's accurate prediction of a suspect's future behavior carried particular weight in the reasonableness of a police officer's belief that the informant had reliable information about the suspect's illegal activities. *Id.* at 332, 110 S.Ct. at 2417. The court may decide whether probable cause existed as a matter of law where the facts and inferences drawn from them leave no room for a difference of opinion on the issue. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir.1993).

*Gates* illustrates the sort of corroboration that may satisfy probable cause. In *Gates,* an anonymous informant named a husband and wife and provided specific information about how the wife would drive a car to

Florida so it could be loaded with drugs before the husband would drive it back to Illinois a few days later. *Gates,* 462 U.S. at 225, 103 S.Ct. at 2325. The authorities independently corroborated that the couple's car was in Florida, that the husband would be flying there in a day or so and that he would be driving north toward Illinois. *Id.* at 244, 103 S.Ct. at 2335. Although the tip in *Gates* gave no indication of its reliability or the basis for the informant's knowledge, and although the couple's travel could have suggested an innocent vacation trip, the Court noted that if an informant is right about some facts, he is "more probably right" about other facts, including the claims involving the suspect's criminal activity. *Id.* at 227, 243–44, 103 S.Ct. at 2326, 2334–35. The officers' independent corroboration of some significant aspects of the tip sufficed for "the practical, common-sense judgment called for in making a probable cause determination." *Id.* at 244, 103 S.Ct. at 2335.

■ In *Gates,* the Court was considering whether probable cause existed to issue a search warrant. *Id.* at 226, 103 S.Ct. at 2325. But the *Gates* analysis also applies to whether probable cause existed to support a warrantless arrest. *United States v. Towns,* 913 F.2d 434, 439–40 (7th Cir.1990). In *Towns,* an informant with no history of reliability accurately described a bank robbery suspect, his car, his living situation and his first name. The Seventh Circuit held that police had probable cause to arrest the suspect once they independently corroborated those facts. *Id.* at 439–41. In *United States v. Herrera,* 757 F.2d 144 (7th Cir.1985), an anonymous tipster gave police the suspect's last name, said he was among a group of people dealing heroin at a specific address, and said a person named "Javier" was associated with the house. *Id.* at 146. After learning that a person named Javier was listed as the subscriber for telephone and electrical service at that house, the police found traces of heroin in the garbage abandoned outside the house. *Id.* at 146–47. The suspect, who was not Javier, and another man arrived at the house while the police were obtaining a search warrant, and they emerged from the house a few minutes later carrying plastic and brown paper bags. *Id.* at 149. The appeals court

affirmed the district court's conclusion that under the totality of the circumstances, probable cause existed to arrest the suspect, despite his argument that police had no evidence linking him to the house. *Id.* at 149. In *United States v. Foxworth,* 8 F.3d 540 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994), a reliable informant accurately predicted the suspect's procedures and movements in conducting a drug transaction in a motel parking lot, providing the police with probable cause to make a warrantless arrest. *Id.* at 543–44.

■ Defendants in this case point out that the informant was not entirely anonymous. The officers knew that the informant was a PACE bus driver. But there is no evidence that the officers knew the identity of the driver, and therefore they could not have known whether this particular driver had provided reliable information in the past. Defendants argue that because the tipster was a bus driver, he or she had no motive to lie. The tipster's occupation might suggest that the tip was reported as a part of the driver's official duties, but other than that, the officers would have had no basis to conclude that bus drivers are less prone to lying or exaggerating than anyone else. The need to corroborate the tip was not lessened by the fact that it came from a PACE bus driver.

So what corroboration did the officers achieve? The tipster said that five black men were at the bus station, and that he or she thought the men were involved in a drug deal. Defendant's Rule 12(n) Statement, Exh. A at 57. The tip included no description of the five black men, other than their race. It included no observations or other facts that might have supplied a basis for the tipster's having "thought" there was a drug deal. In short, the tipster provided very little information to corroborate. Defendants argue that they nonetheless corroborated the tip when Cabrera went to the bus station a few minutes later and found: (1) four black men standing relatively close together outside the station, and (2) two self-sealing bags of a substance that appeared to be marijuana in Eugene Edwards' garment bag.

The court does not doubt that Cabrera corroborated the part about several black men being at the station. Obviously that falls far short of probable cause to arrest Walter Edwards. Defendants go on to argue that they also verified that a drug deal had taken place once Cabrera found the drugs in Eugene's garment bag, after having observed him as one of the four black men at the station. Defendants argue that at this point Cabrera was aware of "reasonably trustworthy information" from which "there can be no question that a reasonably 'prudent person' would believe that a drug transaction had just occurred at the bus station." Defendant Redmond's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, at 8.

The court simply does not agree with that conclusion. By itself, the observation of several black men at a bus station could not serve as reasonable corroboration for the information that a drug deal had taken place, unless one were to accept the absurd proposition that because the men were black, they were involved with drugs. The discovery of drugs in Eugene's bag, coupled with his being among the black men standing at the bus station, did not corroborate any suspicion that a drug transaction had just taken place outside the bus. Black men plus drugs still does not equal a drug deal.[3] The officers in this case do not state they saw drugs or money change hands. They do not present evidence that they spoke to any witness who had actually seen a drug deal, or that they attempted to identify, locate or interview the informant bus driver. They present no evidence that Eugene Edwards, Walter Edwards or anyone else (including the group of black persons interviewed by the third officer on the scene) admitted to them that a drug deal had taken place. They do not assert facts showing that Eugene or Walter gave a false name, lied to the police or told them an unlikely or contradictory story. They have pointed to no furtive behavior by anyone at the station. They have submitted no evidence that they located the sellers or recovered any cash that might have been used to buy the drugs. Eugene certainly obtained the marijuana from someone, somewhere at some definite time, but that could have been from anyone, anywhere and anytime. Eugene may have had a large wet spot on the front of his pants, and this might or might not have supported the inference that Eugene was nervous about talking to the police, but that along with the other evidence could not persuade a reasonable officer that a drug deal had just taken place or that Walter Edwards was involved in one. At most, the defendants' corroborative efforts yielded probable cause to arrest Eugene Edwards for possession of marijuana, but no more.

Defendants further argue that "[t]he discovery of drugs on Eugene, one of the few black men located at the bus terminal, within minutes of the tip led to the reasonable conclusion [that] Eugene's brother, Plaintiff, had also been one of the black men reported as participating in the transaction." *Id.* at 9. But probable cause to arrest Walter Edwards still hinges on probable cause to believe that a drug transaction had taken place involving him, and as we have concluded, the officers had not sufficiently corroborated that notion. This lack of corroboration did nothing to compensate for the tip's weak "basis of knowledge" regarding drug activity. In addition, defendants argue that because Eugene was the suspected purchaser of the drugs and hailed from Arkansas, it would be reasonable for the officers to conclude that he needed someone with ties in the Chicago area to procure a local drug seller. "Eugene's brother, Plaintiff, was a likely candidate for that role given his local residence and relationship with Eugene." *Id.* at 8. This latter argument also crumbles in the absence of probable cause to believe that a drug deal had taken place. Moreover, there is no evidence to support the suggestion that someone with "local ties" was needed. In any event, the court is concerned only with the officers' information and beliefs at the

---

3. The court is excluding the tip itself from the calculus of whether the officers had probable cause. Unless some degree of trustworthy corroboration is found, the tip will be of little or no value in the determination of whether probable cause existed based on the totality of the circumstances. The tip itself cannot be used to bootstrap defendants' argument that they corroborated the tip.

time of the arrest. The portion of defendants' brief in which this argument appears contains no citation to the record, and there is no evidence that Cabrera or Redmond entertained such a belief *at the time* they arrested Walter Edwards.

Defendants cite *United States v. Allen*, 986 F.2d 1354 (10th Cir.1993), in which the police received an anonymous tip that two black men from Detroit, Michigan, were at a certain apartment in Junction City, Kansas, in possession of a large amount of cocaine. *Id.* at 1355. After locating the two men in a nearby parking lot, police recognized one of them as a person wanted on a warrant. Upon searching him, they found a large amount of cocaine. No cocaine was found on the other man, Brandon Allen, who later challenged the grounds for his arrest. The Tenth Circuit held that the arrest was proper, even if based only on the discovery of cocaine on Allen's companion. *Id.* at 1357. But the *Allen* court also noted that "[t]he informant had correctly described the suspects and predicted their location and the crack cocaine that they would be carrying." *Id.* In addition, the police in *Allen* knew at the time of arrest that a man from Detroit named "Brandon" was involved in the drug trade in Junction City. *Id.* at 1356. In Walter Edwards' case, the informant provided no description specific enough to be corroborated, either of the men at the bus station or of the drugs that supposedly were being sold. The informant did not even go so far as to say that he or she had seen a drug transaction, or that one had definitely taken place.

To the extent this court would follow *Allen*, we find it distinguishable.[4] Defendants Cabrera and Redmond have presented no evidence that they had independent knowledge or corroboration that either Walter or Eugene Edwards had been involved in drug dealing. The facts of this case are unlike those in *Gates, Towns, Herrera* or *Foxworth*. In those cases, the tips provided information

that, once corroborated, led to a valid determination of probable cause; the tip accurately predicted a suspect's future behavior; or the police investigation led to the officers' having observed the suspect doing some act that indicated criminal behavior. As this opinion has explained, the tip in this case provided very little specific or incriminating information in the first place, other than what, from all the officers could surmise, could have been merely the tipster's hunch that a drug transaction had taken place. The subsequent police investigation revealed that Walter Edwards' only apparent connections to drugs were his presence at the bus station and his familial relationship to the man on whom the drugs were found. These undisputed facts do not create a genuine issue as to whether Cabrera and Redmond had probable cause to arrest Walter Edwards. Clearly, they did not, and Edwards has therefore established his prima facie case under § 1983.[5]

## B. Qualified Immunity

Qualified immunity will shield the officers from liability to the extent their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Biddle v. Martin*, 992 F.2d 673, 675 (7th Cir.1993) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The Seventh Circuit has described the qualified immunity inquiry as having two prongs:

First, the plaintiff must show that the law was clearly established when the challenged conduct occurred. In this Circuit, we ask "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." *Apostol v. Landau*, 957 F.2d 339, 341 (7th Cir.1992). Second, we evaluate the objective legal reasonableness of the defendants' conduct. We inquire whether reasonably competent officials would agree on the ap-

---

4. It should be noted that *Allen* is susceptible of a distinct factual gloss because Brandon Allen was initially arrested for possession of marijuana after the officers found an unsmoked marijuana cigarette next to his foot and heard him say he "smoked pot." *Id.* at 1354.

5. The defendants do not dispute that, as Skokie police officers, they were acting under color of state law when they arrested·Walter Edwards.

plication of the clearly established right to a given set of facts. (citations omitted).

*McDonnell v. Cournia,* 990 F.2d 963, 968 (7th Cir.1993).

■■■ First, the defendants do not dispute that Walter Edwards had a clearly established right against being arrested without probable cause. The real question, and one which defendants have declined to address, is whether Walter Edwards had a clearly established right "in a particularized sense." *See Hinnen v. Kelly,* 992 F.2d 140, 142–43 (7th Cir.1993). That is, the broad legal standard involving probable cause determinations may be clearly established, but where the application of any legal standard is highly fact dependent, "the 'law' can rarely be considered 'clearly established.'" *Rakovich,* 850 F.2d at 1213 (quoting *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986)). The contours of the right must be sufficiently clear so that reasonable officials would understand that what they are doing violates the right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The Seventh Circuit has stated that "closely analogous cases" are required to find that a constitutional right is clearly established, but the cases need not be precisely on all fours. *Sivard,* 17 F.3d at 189. It is enough that in light of pre-existing case law, the unlawfulness of the action is apparent. *Id.* (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). In this case, prior Supreme Court decisions such as *Gates* and *White* clearly applied to police officers' conduct at the time of Walter Edwards' arrest in May 1992. Under the clearly established law at that time, probable cause for a warrantless arrest based on an informant's tip would not exist without some independent corroboration suggesting to a prudent person that a crime had been or was being committed. In light of *Gates* and *White,* it would have been apparent to a reasonable officer in defendants' position that Walter Edwards had a clearly established right against being arrested on the basis of an anonymous informant's sketchy tip that was insufficiently corroborated. *See Hinnen,* 992 F.2d at 143–144 (citing *United*

*States v. Skinner,* 972 F.2d 171, 176 (7th Cir.1992)).

■■■ Next, the court must evaluate the objective legal reasonableness of Walter Edwards' arrest by asking whether the police acted reasonably under the settled law in the circumstances, and not whether a more reasonable view of the situation can be constructed after the fact. *Hunter v. Bryant,* 502 U.S. 224, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). Police officer defendants will be entitled to qualified immunity from § 1983 unlawful arrest claims if any officer could reasonably have thought there was probable cause to arrest. *Krueger v. City of Algoma,* 1 F.3d 537, 539 (7th Cir. 1993) (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)); *Biddle,* 992 F.2d at 676. In other words, Walter Edwards must demonstrate that reasonable officers assessing the specific facts and relevant law would have known that their conduct violated his constitutional rights. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 435 (7th Cir.1993).

The court already has held that, as a matter of law, defendants arrested Walter Edwards without probable cause. But for purposes of determining whether qualified immunity applies, the United States Supreme Court has stated that in a case where probable cause does not exist, the police officer's mistaken conclusions often may be reasonable nonetheless. *Anderson,* 483 U.S. at 635, 107 S.Ct. at 3034. It may sound counterintuitive to hold that an officer was reasonably mistaken in acting unreasonably, or that an act deemed "unreasonable" under the Fourth Amendment may receive qualified immunity's protection for reasonable official action. The Second Circuit very recently touched upon this apparent anomaly in the law of qualified immunity in § 1983 actions brought for Fourth Amendment violations:

> It is not surprising that the District Court, after ruling as a matter of law that the officers' conduct was unlawful, also ruled as a matter of law that it was objectively unreasonable for the officers to believe that their conduct was lawful. At first blush, the two rulings appear to involve the same question—whether the officers' conduct was objectively reasonable. Indeed,

there is a seeming circularity to inquiring first whether the circumstances as perceived by a reasonably prudent police officer would justify the belief that the persons to be arrested had committed a crime, and, after finding that the circumstances would not justify such a belief, proceeding to inquire whether a police officer could reasonably believe that the officer's conduct was lawful. It is not readily apparent how a police officer could have an objectively reasonable belief that conduct was lawful when the unlawfulness of that conduct rests on a determination that an objectively reasonable police officer would not have acted. And the situation is especially perplexing in a case like the pending one, where, for purposes of removing the first issue from the jury, it has been determined, correctly in our view, that no reasonable juror could fail to find that the officer's conduct was unlawful.

*Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994); *see also McGaughey v. City of Chicago*, 664 F.Supp. 1131, 1139 (N.D.Ill.1987) (Aspen, J.) ("[i]t is difficult, or perhaps impossible, to separate the question of whether an officer had probable cause to arrest an individual from the question of whether an officer acted in a manner which was objectively reasonable under clearly established constitutional law"), *vacated in part on reconsideration*, 690 F.Supp. 707 (N.D.Ill.1988). The Seventh Circuit has seemed to recognize this conundrum at least implicitly by holding that juries should not be instructed on qualified immunity because "[t]o go on and instruct the jury further that even if the police acted without probable cause they should be exonerated if they reasonably (though erroneously) believed that they were acting reasonably is to confuse the jury and give the defendants two bites at the apple." *Llaguno v. Mingey*, 763 F.2d 1560, 1569 (7th Cir.1985) (en banc).[6]

Yet the Supreme Court in *Anderson* has taken the position that qualified immunity in effect does give the defendant two bites at the apple. Rejecting what it termed the "reasonably unreasonable" argument against qualified immunity, the Court noted the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment and added that police officers "whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law." *Id.* at 643–44. The Court has provided precious little guidance, however, on how lower courts should apply the "objective reasonableness" standard at the qualified immunity stage in a Fourth Amendment case after finding that a defendant police officer lacked an objective basis for probable cause.

In *Hinnen*, the Seventh Circuit applied *Anderson* in a § 1983 case brought by plaintiffs who had been named in an anonymous letter as being involved in a drug conspiracy. *Hinnen*, 992 F.2d at 141. Although the police had corroborated substantial details of the letter before obtaining a search warrant, courts later determined the warrant to have been issued in error for lack of probable cause. *Id.* at 442. The officer had confirmed that a person named in the letter owned a particular auto shop, had learned that a package mentioned in the letter had been sent to that same auto shop, and had confirmed the letter's description of several of the individuals' names, addresses, criminal records and relationships among each other. *Id.* at 444. The *Hinnen* court noted that the probable cause issue had been "a close legal question," and one that turned on law not clearly established at the time the warrants were executed. *Id.* at 143. In holding the officers qualifiedly immune, the court also relied on the fact that lower courts had found the officers had relied in good faith on a facially valid warrant, citing *United States v.*

---

**6.** In *Oliveira*, the Second Circuit remanded the "objective reasonableness" component of qualified immunity for consideration by the jury, identifying certain fact disputes that the court said would bear upon whether it was objectively reasonable for the officers in that case to have believed they were acting lawfully. *Oliveira*, 23 F.3d at 649–50. In this case, the facts bearing upon the officer's objective reasonableness are not in dispute, making qualified immunity ripe for determination on summary judgment as a matter of law, as the law of this circuit dictates it should be. *Rakovich*, 850 F.2d at 1202.

*Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In the circumstances of *Hinnen,* the Supreme Court's "reasonably unreasonable" distinction in *Anderson* seemed to apply. The officers corroborated much of the tip and obtained a warrant, but the warrant's failure on Fourth Amendment grounds did not control the determination of whether a reasonable officer would have known he or she was acting unlawfully. The officers were reasonably mistaken in their belief that the search was reasonable. *Hinnen,* 992 F.2d at 144.

■ This is not such a case. The lack of probable cause to arrest Walter Edwards was not a close legal question. Defendants did not act pursuant to a facially valid warrant. For purposes of § 1983 liability, qualified immunity draws the line where no reasonable police officer would believe that probable cause existed, and these defendants crossed that line. Our appeals court has had several occasions to hold that police officers' mistakes or misdeeds regarding probable cause were not reasonable. In *Jones v. City of Chicago,* 856 F.2d 985 (7th Cir.1988), the court held that the defendant police officers were not entitled to qualified immunity against a § 1983 suit where they arrested the plaintiff for murder based on witness identifications that were "worthless." *Id.* at 995. In *Juriss v. McGowan,* 957 F.2d 345 (7th Cir.1992), the court rejected the defense of qualified immunity where the police arrested the plaintiff for aiding a fugitive—her ex-husband—despite having strong reason to believe that she did not know he was a fugitive. *Id.* at 349–51. In *Jones* and *Juriss,* the facts demonstrated some sort of affirmative misfeasance by the police. The case law also states that qualified immunity does not protect "the plainly incompetent" or "those who knowingly violate the law." *Biddle,* 992 F.2d at 678 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

By arresting Walter Edwards without probable cause, defendants Cabrera and Redmond may have been merely incompetent, or they may have known of the illegality of the arrest. Either way, they are not entitled to qualified immunity, because no reasonable officer, knowing what defendants knew, could have believed that arresting Walter Edwards was lawful under those circumstances. There was probable cause to arrest Eugene Edwards, in whose garment bag the drugs were found. But as to the plaintiff, Walter Edwards, defendants had no information linking him to the drugs in his brother's bag or to any drug deal. All they knew for sure was that Walter Edwards had stood next to two men and his brother Eugene before Eugene boarded the bus with some marijuana in his bag, and that an anonymous PACE bus driver had thought a drug deal had taken place a few minutes earlier. If defendants had independently collected any evidence of a drug deal or of suspicious behavior by Walter Edwards, this might be a closer case. But on these undisputed facts there was not enough evidence to persuade any reasonable officer to believe there was probable cause to arrest Walter Edwards. *Cf. Scott v. Glumac,* 3 F.3d 163, 166–67 (7th Cir.1993) (reversing grant of summary judgment in favor of a police officer defendant who asserted the defense of qualified immunity in suit for destruction of plaintiff's seized automobile where no evidence could support a reasonable officer in believing that plaintiff had driven the car to facilitate his drug offenses).

Accordingly, defendants Cabrera and Redmond may not avail themselves of the shield of qualified immunity. Defendants' cross-motions for summary judgment on Count I therefore will be denied, and plaintiff's motion for summary judgment on Count I will be granted as to the defendants' liability under § 1983.

## IV. Count II: The False Imprisonment Claim

Under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, a public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct. 745 ILCS 10/2–202. The Act defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional,

shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210.

 Unlike the objective analysis involved in deciding qualified immunity, the question of willful and wanton conduct goes to the subjective intent of the individual defendants. *See Sank v. Poole,* 231 Ill.App.3d 780, 173 Ill.Dec. 319, 323–24, 596 N.E.2d 1198, 1202–03 (4th Dist.1992) (citing *Loitz v. Remington Arms Co.,* 138 Ill.2d 404, 150 Ill.Dec. 510, 563 N.E.2d 397 (1990)). The evidence submitted so far on this motion for summary judgment consists primarily of the testimony taken at the hearing on Eugene Edwards' motion to suppress evidence in state criminal court. That transcript provides a great deal of information as to the events at the bus station on the day of the arrest. But it provides little or no information concerning the defendants' mental state, or whether their conduct "approaches the degree of moral blame attached to intentional harm" or the deliberate or reckless infliction of "a highly unreasonable risk of harm upon others." *See Sank,* 173 Ill.Dec. at 323–24, 596 N.E.2d at 1202–03.

Therefore the record is not sufficiently developed for the court to determine whether a genuine issue of material fact exists as to the defendants' state tort immunity from the allegations in Count II. For these reasons, all motions for summary judgment on Count II will be denied.

*CONCLUSION*

For the reasons explained in this opinion, the court grants plaintiff's summary judgment motion as to § 1983 liability in Count I and denies it as to Count II. Defendants' cross-motions for summary judgment are denied as to both counts.